IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HAROLD K. WOOTEN,<br><br>          Plaintiff,<br><br>     v.<br><br>PRUDENTIAL INSURANCE COMPANY OF AMERICA,<br><br>          Defendant. | No. C03-02558 MJJ<br><br>**FINDINGS OF FACT AND CONCLUSIONS OF LAW** |

In this action, Plaintiff Harold K. Wooten seeks to recover long term disability benefits under a group employee welfare benefit plan ("the Plan") issued by Defendant Prudential Insurance Company of America. Plaintiff's benefit claims are governed by the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, *et seq*. On May 30, 2006, the Court held a bench trial on Plaintiff's claim to long term disability benefits under the Plan. Prior to the trial, the parties submitted trial briefs framing the issues before the Court and identifying the evidence in support of their respective positions. After carefully considering the parties' arguments and thoroughly reviewing the administrative record, the Court makes the following findings of fact and conclusions of law.

**I.     Findings of Fact**

   **A.     Procedural Background**

   1.     Plaintiff is a covered employee under the Villa Marin Long Term Disability Plan. (Doc. #61 at 13.) Prudential is a fiduciary for the Plan, and the insurer for the disability policy providing benefits under the Plan. (*Id*. at 1.)

2.      On July 19, 2001, Plaintiff suffered a major, life-threatening dissection of his aorta and underwent emergency surgery to partially repair the dissection. (HW 2018.)

3.      Subsequently, on November 6, 2001, Plaintiff submitted a claim to Prudential for disability benefits under the Plan. (WOO 87, 83-90, 103-04.)

4.      Prudential, however, determined that Plaintiff was not a member of the covered class of Villa Marin employees at the time of his claimed disability, and denied his claim. (WOO 81.)

5.      In May 2003, Plaintiff initiated this lawsuit against Prudential, asserting claims under 29 U.S.C. § 1109, § 1132(a)(1)(B), § 1021(a), § 1024(b)(4), § 1132(a)(3), § 1132(c), and § 1132(g). In Count One, Plaintiff asserts that Prudential breached its fiduciary duty by refusing to pay benefits under the Plan. In Count Two, Plaintiff asserts that Prudential breached its fiduciary duty by failing to provide Plan information relating to his rights and benefits under the Plan. Plaintiff seeks a judgment awarding him benefits under the Plan and clarifying his right to future benefits.

6.      On July 9, 2004, the Court held a trial on Plaintiff's claims.

7.      On September 20, 2004, the Court issued its Findings of Fact and Conclusions of Law (Doc. #61.) The Court held that Prudential erroneously denied Plaintiff's November 6, 2001 claim on the ground that Plaintiff was not a covered employee under the Plan. (*Id*. at 13.) Further, the Court concluded that, "even though [Plaintiff] was a covered employee under the [P]lan at the time he suffered the cardiovascular aneurism and partially dissected aorta . . . [the] matter should be remanded to Prudential for a determination of [Plaintiff's] disabled status from July 19, 2001 to present." (*Id*. at 10.) Particularly, the Court determined that the record was insufficient for it to determine whether Plaintiff was disabled under the Plan, the duration of any disability, and whether the disability qualified Plaintiff for long term benefits. (*Id*.)

8.      Following remand, on March 22, 2005, Prudential determined that Plaintiff was eligible for disability benefits for a portion of the "own occupation" period, spanning October 18, 2001 through May 31, 2002. (PRU 0003.) In its letter advising Plaintiff of this decision, Prudential also indicated that because Plaintiff had not provided medical records dated later than May 25, 2002, it was unable to determine whether Plaintiff's condition qualified him for benefits after May 2002. (PRU 0004.) Prudential therefore requested that Plaintiff provide these records. (*Id.*)

9. In response, on April 19, 2005, Plaintiff submitted additional medical records, including a report by his primary care physician, Dr. Krista Muirhead, M.D. (HW 2018-2031).

10. Subsequently, on May 11, 2005, Prudential notified Plaintiff that it had reviewed the medical evidence he submitted, and determined that he was eligible to receive benefits for the entire "own occupation" period of the Plan, providing benefits through October 17, 2004. (PRU 0004.) Prudential further explained that, to determine whether Plaintiff was entitled to long term disability benefits under the "any occupation" provision, "[a]s of October 18, 2004, [it] must determine that [Plaintiff] is unable to perform the material and substantial duties of any job for which he is reasonably fitted by his education, training, or experience[.]" (PRU 0005.)

11. Toward this end, Prudential arranged for Dr. Mark Friedman, a specialist in cardiovascular diseases and internal medicine, to review Plaintiff's medical records. (PRU 0015.)

12. Prudential also arranged for a vocational assessment of Plaintiff's medical restrictions to determine whether alternative occupations existed.

13. On June 6, 2005, Prudential notified Plaintiff that it had completed its review of his long term disability benefits claim under the "any occupation" portion of the Plan, and determined that he was not eligible to receive benefits beyond October 17, 2004. (PRU 0016.)

14. In its letter to Plaintiff, Prudential stated:

> The reviewing physician, Dr. Friedman and [Plaintiff's] treating physician, Dr. Muirhead, each indicate that [Plaintiff] should avoid physical or emotional stress that could result in elevation of his blood pressure. Both physicians also indicate that [Plaintiff's] restrictions are unlikely to improve due to the inoperable aortic dissection. However, neither Dr. Muirhead, nor Dr. Friedman indicate that [Plaintiff] is disabled from all work, and the restrictions recommended by both physicians would allow for [Plaintiff] to work in another capacity.

(PRU 0016.) Prudential also cited the vocational assessment which identified several vocational alternatives for Plaintiff in occupations for which he is reasonably fitted and are within the recommended medical restrictions. (*Id.*)

15. Based on its consideration of Plaintiff's medical records, Dr. Muirhead and Dr. Friedman's reports, and the vocational assessment, Prudential concluded as follows:

> As our review of the medical evidence indicates that [Plaintiff] is capable of working in another capacity, and our vocational assessment has identified vocational alternatives within his medical restrictions and

3

> experience, we have determined that [Plaintiff] is not disabled from performing the material and substantial duties of any occupation and he is not eligible to receive additional benefits under the terms of the policy. Therefore [Plaintiff's] claim has been terminated effective October 18, 2004.

(PRU 0017.)

16. On December 9, 2005, Plaintiff appealed Prudential's decision. (HW 2041a.) In his letter to Prudential, Plaintiff asserted that he had provided the following "key evidence" to Prudential in support of his claim: the Social Security Administration's determination that he is totally disabled; the established side effects of the medications he must take from the National Library of Medicine and National Institute of Health; Plaintiff's description of his daily life; a description from Plaintiff's friend describing Plaintiff before and after his aortic dissections; a report from vocational expert, Jeff Beeman; and details of job requirements for each of the alternative positions that Prudential identified showing that they are beyond his medical restrictions and capabilities. (PTB at 8-9.)

17. Plaintiff claims that after he submitted his appeal, Prudential failed to respond within 45 days, as required by 29 C.F.R.§ 2560.503-1(I)(3). Prudential, however, maintains that after Plaintiff submitted additional correspondence and documentation in support of his appeal, it notified him on January 20, 2006 that it was continuing its review of his appeal and would advise him regarding the status of its evaluation within 30 days. Plaintiff denies receiving this notice.

18. On January 27, 2006, Plaintiff filed a Request for a Trial Date. (Doc. #62.)

19. In response, the Court set a briefing schedule and a trial date. (Doc. #64.)

**B.   The Total Disability Provision**

20. To recover long term disability benefits under the Plan, Plaintiff must establish that he is totally disabled under the Plan. The Plan's Total Disability Provision provides:

> "Total Disability" exists when Prudential determines that all of these conditions are met:
>
> (1) Due to Sickness or accidental injury, both of these are true:
>
> (a) You are not able to perform, for wage or profit, the material and substantial duties of your occupation;
>
> (b) After the Initial Duration of a period of Total Disability, you are not able to perform for wage or profit the material and substantial duties of any job for which you are reasonably fitted by your education, training, or experience. The Initial Duration is shown in the Schedule of Benefits.

4

    (2) You are not working at any job for wage or profit.

    (3) You are under the regular car of a Doctor.

(WOO 38.)

**C.    Evidence Relating to Plaintiff's Qualification for Long Term Disability Benefits**

    21.    Plaintiff's education and occupational background is in finance and accounting. His previous occupation was Director of Finance for Villa Marin. (PRU 0011.)

    22.    On July 19, 2001, Plaintiff was diagnosed with a large "type A" aortic dissection extending from the aortic root to the ascending aorta and aortic arch, continuing through the entire descending thoracic aorta and into the upper abdominal aorta. (K0729_0025.)

    23.    That same day, Plaintiff underwent emergency surgery, during which the surgeons repaired a portion of the dissection with a graft and resuspended the aortic valve. (K0711_0143.)

    24.    Following the July 2001 surgery, Plaintiff continued to experience problems and complications relating to the aortic dissection, and was hospitalized several times after surgery due to post-operative complications. (HW 2018.)

    25.    Additionally, in the months after his surgery, Plaintiff developed additional dissections. (HW 2018.)

    26.    As a result of the aortic dissections, Plaintiff suffers from bleeding from the aorta, blood clot formation, insufficient circulation past the area of the dissection, and kidney damage. (HW 2018.)

    27.    Plaintiff also suffers from high blood pressure, which requires "aggressive blood pressure management." (K0711_0031, K0711_0036.) Specifically, Plaintiff must maintain a blood pressure below 140. (HW 2003; K0711_0041.)

    28.    Dr. Krista Muirhead has been Plaintiff's primary care physician since July 19, 2001. In her April 14, 2005 letter to Prudential, she indicates that on that on July 19, 2001, Plaintiff "was diagnosed as suffering from a large "type A" aortic dissection extending from his aortic root to the ascending aorta and aortic arch and continuing through the entire descending thoracic aorta into the upper abdominal aorta, causing severe aortic insufficiency." (HW 2018.)

    29.    Dr. Muirhead also offered the following assessment of Plaintiff's condition:

> As Wooten's abdominal aortic dissection is inoperable, it will remain with Wooten for the rest of his life. In order to survive, Wooten

> must maintain aggressive blood pressure management. Since the original diagnosis of the dissections, Wooten has been on a number of medications to control his pain level and blood pressure. Wooten's current medications include: Zocor, Lisinopril, Nifedipine, Cozaar, Metoprolol, and Vicodin. Wooten will need to continue these or similar medications for the rest of his life.
>
> Due to his condition, Wooten has been, and continues to be, limited in his life activities. He reports that he tires easily. Since May 2002, he has reported further problems with pain and weakness in his muscles and visual disturbances. Also, with the dissection and aortic graft, it would be inappropriate for Wooten to do heavy lifting.
>
> From July 19, 2001 to present, Wooten could not return to his former job as Director of Finance or any other job involving stress or activities that would elevate his blood pressure. Further, as Wooten's condition is inoperable and ongoing, there is no reason to suspect that his inability to work in such stressful environments will change any time in the future.
>
> Based on Wooten's medical conditions, I have not released, and cannot foresee releasing, Wooten to return to any stressful occupation, including any Director of Finance type position.

(HW 2018-19.)

30. To control his pain level and blood pressure, Plaintiff takes multiple medications, including: Zocor, Lisinopril, Nifedipine, Metoprolol, Vicodin, and Cozaar. (HW 2018.)

31. As indicated above, as part of its review on remand, Prudential asked Dr. Mark Friedman, M.D., a cardiovascular diseases and internal medicine specialist, to review Plaintiff's medical records. On February 28, 2005, Dr. Friedman issued his Report. Dr. Friedman identified the two questions for review as:

> 1. Does the medical evidence provide support of a sickness or injury that would have impacted Mr. Wooten's work capacity since July 19, 2001?
>
>    A. If so, please outline appropriate restrictions and limitations.
>
> 2. Please address any changes in Mr. Wooten's medical conditions and any associated restrictions and limitations over the course of time.

(PRU 0034.)

32. In response to these questions, Dr. Friedman opined, in relevant part:

> 1. The medical record does provide support of a sickness that would have impacted Mr. Wooten's work capacity since July 19, 2001.
>
>    A. Appropriate restrictions and limitations include:
>
>    - Avoid strenuous physical activity

6

|   |   |
|---|---|
| - | Avoid lifting greater than 20 pounds |
| - | Avoid activity that could result in chest injury or abdominal injury |
| - | Avoid exposure to temperature extremes or humidity |
| - | Avoid climbing stairs, ladders or working at heights |
| - | Avoid exposure to dirt, dust, and fumes |
| - | Avoid physical or emotional stress that could result in elevation of the patient's blood pressure. |

(PRU 0036.)

33. Dr. Friedman further opined:

> The patient has a history of an ascending aortic dissection that caused aortic insufficiency in July 2001. The patient has successful surgical repair of the dissection and resuspension of the aortic valve. Later the patient was evaluated for abdominal and back pain and he was found to have an extensive dissection of the descending thoracic aorta that extended to the right iliac artery. The patient was noted to have a partial infraction of a kidney due to the dissection. The patient has been maintained on medical therapy for hypertension and he was advised to have follow-up CT scans every six months to monitor the dissection. The patient had a CT scan on 05/25/2002 that showed no change in the dissection.
>
> There are no records available for review dated after 05/25/2002 to indicate the patient's current clinical status. The patient's history of an aortic dissection with surgical repair and the history of the subsequent descending thoracic aortic dissection would support continued restrictions and limitations as noted above.

(PRU 0036-37.)

34. Prudential also retained Robyn David-Harris, M.A., M.S., C.R.C., C.V.E., of Crawford Healthcare Management to prepare a Transferable Skills and Labor Market Survey Report. (PRU 0010-0013.) In her May 23, 2005 Report, Ms. David-Harris indicated that she reviewed Dr. Friedman's Report and the work restrictions he outlined. She then identified several alternate jobs that fit within Plaintiff's restrictions, including: accountant, underwriter - mortgage loan, loan processor, insurance clerk, and accounting clerk. (PRU 0011.) Ms. David-Harris also conducted a labor market survey to determine the availability of the jobs identified in the Transferable Skills Analysis. (*Id.*) After contacting human resources representatives at several Bay Area companies, she determined that multiple jobs existed in the Bay Area that were identified in the Transferable Skills Analysis. (*Id.*)

**II.   Conclusion of Law**

35. As both parties acknowledge, the Court reviews Prudential's decision denying Plaintiff's benefits claim *de novo*. *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 111 (1989).

36. ERISA authorizes suits against fiduciaries and plan administrators in order to remedy breach of fiduciary duty. 29 U.S.C. § 1109. Participants in a plan covered by ERISA can file suits to "recover benefits due . . . under the terms of the plan, to enforce . . . rights under the terms of the plan, or to clarify . . . rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B).

37. Plan administrators are required to provide a clear accounting of why benefits were denied and a "full and fair review" of any denial of benefits. 29 U.S.C. § 1133.

38. In reviewing Prudential's decision, the Court has the power to award disability benefits to Plaintiff or to remand the case to the Plan Administrator for further factual development. *See Patterson v. Hughes Aircraft Co.*, 11 F.3d 948, 951 (9th Cir. 1993).

39. Prudential contends that because Plaintiff failed to exhaust the administrative review process before re-instituting this action in federal court, the Court should not consider the additional information that Plaintiff submitted as part of his December 9, 2005 appeal. According to Prudential, after Plaintiff filed his appeal, it advised him on January 20, 2006, that it was extending its time to render a decision on the appeal to perform a thorough review of the additional material he submitted. It contends that before it could issue its decision, Plaintiff filed his request for a trial date. Plaintiff, however, maintains that Prudential failed to take any action within 45 days after it filed its appeal, as required by 29 C.F.R. § 2560.5031(I)(3) and Prudential's letter denying his claim. Thus, Plaintiff asserts that he exhausted his administrative remedies. Considering these arguments, the Court notes that Prudential is not urging the Court to decline to hear this matter. (*See* Doc. #77, Prudential's Supp. Trial Br. at 1, 3.) Rather, Prudential urges the Court to exclude from its review the evidence Plaintiff submitted with his December 9, 2005 appeal, namely, Plaintiff's statement of his physical condition and limitations (HW 2042), Starr Babcock's letter regarding Plaintiff's condition (HW 2042a), the Social Security Administration's Notice of Award (HW 2043), the U.S. National Library of Medicine and the National Institutes of Health's descriptions of aortic dissection and Plaintiff's prescribed medications (HW 2048-2103f.), O*Net Occupational Network descriptions of various jobs (HW 2103g-2170), and Jeff Beeman's Vocational Report (HW2174). As discussed in greater detail below, because there was sufficient evidence in the record at the time Prudential denied Plaintiff's claim to support a finding of total disability, the Court declines to consider the additional evidence Plaintiff submitted to Prudential

8

with his December 2005 appeal.

40.     Plaintiff contends that Prudential's denial of his claim for long term disability benefits from October 18, 2004 onward, is in error.  Particularly, Plaintiff asserts that his inoperable aortic dissections, the effects of his ongoing medications, his physical and cognitive limitations, and his inability to tolerate any stress render him "totally disabled" under the Plan, and entitle him to long term disability benefits.  He therefore requests that the Court award him past and future benefits under the Plan.

41.     Prudential, however, maintains that it properly denied Plaintiff's claim for long term disability benefits because neither Plaintiff's treating physician, Dr. Muirhead, nor the independent file review physician, Dr. Friedman, opined that Plaintiff is unable to perform the "material and substantial duties of any job" such that Plaintiff could be found totally disabled.

42.     In support of his position, Plaintiff first argues that the question is not whether he can work at "any job," but whether he can work with reasonable continuity at a job for which he is "reasonable fitted" by his "education, training, or experience."  Particularly, Plaintiff advances that "[t]otal disability for an any occupation period means the inability to perform the essential, *i.e.*, the 'material and substantial,' duties of a comparable person."  (PTB at 10 (citing *McClure v. Life Ins. Co.*, 84 F.3d 1129, 1134 (9th Cir. 1996); *Saffle v. Sierra Pac. Power Co.*, 85 F.3d 455, 458 (9th Cir. 1996).)  Further, Plaintiff submits that "[a] person is also considered totally disabled if he or she cannot perform the essential job duties with continuity."  (*Id.*)

43.     Prudential has not presented any argument responding to Plaintiff's proffered construction of the "Total Disability" provision in the Plan.

44.     The Court finds that the provision is unambiguous as to what criteria the Court must examine in determining whether Plaintiff is totally disabled.  Specifically, the Plan requires that a claimant demonstrate that, as a result of sickness or injury, he cannot perform the material and substantial duties of any job for which he is reasonably fitted based on his education, training, and experience.  Plaintiff's argument that the Court must consider whether he can perform the "essential" duties of any job does not clarify the Plan's definition, but merely substitutes a synonym for the terms "material and substantial."  Because the Court finds no ambiguity in the Total Disability provision, the

9

plain meaning of its terms control.

46. In his Trial Brief, Plaintiff contends that the fact he suffers from an aortic dissection conclusively establishes that he is totally disabled under the Policy. For the following reasons, the Court disagrees with Plaintiff.

46. Plaintiff first argues that his aortic dissections are *per se* disabling conditions. In support, he proffers an excerpt from the National Library of Medicine / National Institute of Health, which provides as follows:

> **Definition**: Aortic dissection is a condition in which there is bleeding into and along the wall of the aorta (the major artery from the heart).
>
> . . . .
>
> **Expectations (prognosis)**: Aortic dissection is life-threatening. The likelihood of death within the first 48 hours is 1% per hour for untreated patients. The disorder is curable with surgical repair if it is performed before aortic rupture. Less than half of patients with ruptured aorta survive.
>
> **Complications**: bleeding from the aorta; aortic rupture causing rapid blood loss; clot formation; insufficient circulation part the area of the dissection; irreversible kidney failure; stroke; heart attack; cardiac tamponade - a condition where fluid accumulates in the lining of the heart, which impairs the heart's ability to pump out blood.

(PTB at 11; HW 2049-2050.) Plaintiff also cites language from *Bornstein v. J.C. Penny Life Ins. Co.*, 946 F. Supp. 814, 820 (C.D. Cal. 1996), wherein the district court described the condition as:

> Aortic dissection is longitudinal splitting of the arterial wall resulting from hemorrhage. Basically, dissection occurs where blood flows between the inner and outer walls of the artery rather than through the usual central pathway. This can cause constriction of the interior diameter of the artery, and consequent reduced blood flow through it.

Relying on these definitions, Plaintiff asserts that his aortic dissection, alone, renders him totally disabled.

47. The Court, however, disagrees with Plaintiff. While the medical descriptions of an aortic dissection that Plaintiff has proffered may support his position that he is totally disabled, the descriptions, standing alone, are insufficient to establish that Plaintiff is totally disabled. Particularly, the central question is whether Plaintiff has presented sufficient evidence to support a disability finding according to the criteria set forth in the Plan's Total Disability provision. Nothing in that provision, or the Plan, generally, states that evidence of an aortic dissection is conclusive evidence of total disability.

10

48. Plaintiff next argues that the fact that an unrepaired aortic dissection is considered a totally disabling condition under Social Security's Listing of Impairments, 20 C.F.R. Pt. 404, Subpart P., App. 1, section 4.10, demonstrates that his condition is total disabling as a matter of law, entitling him to long term benefits under the Plan.

49. The Court, however, disagrees with Plaintiff. As Plaintiff acknowledges, the Social Security Administration's findings are not binding on courts reviewing ERISA claims. *See, e.g., Wible v. Aetna Life Ins. Co.*, 375 F. Supp. 2d 956, 971 (C.D. Cal. 2005) (citing *Kirwan v. Marriott Corp.*, 10 F.3d 784, 790 n.32 (11th Cir. 1994)). In fact, Plaintiff cites no Ninth Circuit authority indicating that a determination of disability under the Social Security regime is relevant to determining disability in an ERISA action. To be sure, the same evidence that supported Plaintiff's SSA disability determination may be relevant to determining total disability under the Plan. However, without authority holding that this Court must find that the SSA's legal determination of disability is determinative in an ERISA matter, the Court rejects Plaintiff's argument.[1]

50. Plaintiff further contends that other courts have held that plan beneficiaries with severe cardiovascular conditions are totally disabled within the meaning of ERISA plans. In support Plaintiff cites *Finazzi v. Paul Revere Life Insurance Co.*, 327 F. Supp. 2d 790 (W.D. Mich. 2004); *Buffaloe v. Reliance Standard Life Ins. Co.*, 2000 WL 33951195 (E.D.N.C. 2000); and *Saliamonas v. CNA, Inc.*, 127 F. Supp. 2d 997 (N.D. Ill. 2001).

51. The Court has reviewed these decisions and finds that they do little to advance Plaintiff's case. Specifically, the determination the Court must make in the instant matter is fact-specific to Plaintiff. While other courts assessing claimants with similar conditions may have concluded that the claimant was totally disabled, those decisions do not compel the conclusion that Plaintiff's aortic conditions render him totally disabled under the terms of his Plan.

52. Next, Plaintiff argues that courts have held that if working puts a plan beneficiary at risk of further injury or death, the beneficiary is totally disabled. He argues that because he faces the risk of further aortic rupture, kidney failure, and/or death if his blood pressure is elevated, the Court should

---

[1] Furthermore, Plaintiff did not submit the SSA's Notice of Award (HW 2043) until he filed his Appeal.

11

conclude that he is totally disabled. To the extent that Plaintiff has presented evidence that certain activities or conduct associated with working exacerbate his risk of further health risks or death from his medical conditions, thereby rendering unable to work, this evidence may be <u>relevant</u> to determining whether Plaintiff is totally disabled under the Plan. However, the Court rejects Plaintiff's argument that such evidence is dispositive on the issue whether he is totally disabled.

53. Having rejected Plaintiff's various arguments that certain pieces of evidence, in isolation, conclusively establish that he is totally disabled, the Court turns to the evidence before Prudential at the time it rendered its decision denying Plaintiff's claim. Having thoroughly reviewed the administrative record as it stood on June 6, 2005, the Court finds the following evidence, cumulatively, supports a finding that Plaintiff is totally disabled.

54. It is undisputed that Plaintiff suffers from severe Type A aortic dissection, which causes severe aortic deficiency. Although Plaintiff underwent surgery to correct the condition, the surgeons were only able to partially repair the dissection.

55. Since being diagnosed with an aortic dissection in July 2001, Plaintiff has experienced continuous medical complications both relating to, and in addition to, the aortic dissection. Specifically, Plaintiff suffers from life-threatening high blood pressure that he must vigilantly maintain below 140.

56. Plaintiff also suffers from bleeding of the aorta, blood clots, kidney damage, poor circulation past the area of the dissection, headaches, visual disturbances, muscle fatigue, and chronic pain.

57. Dr. Muirhead - Plaintiff's primary care physician - opened that Plaintiff's condition is inoperable and that managing his blood pressure is crucial to Plaintiff's survival. As a result, Dr. Muirhead opined that Plaintiff could not return to his job as Director of Finance at Villa Marin and could not work in any job that would elevate his blood pressure or expose him to stress.

58. Prudential's medical specialist, Dr. Friedman, concluded that Plaintiff's medical record did support a finding that Plaintiff's heart condition affected his work capacity, and recommended significant restrictions. Most notably, Dr. Friedman indicated that Plaintiff should avoid physical or emotional stress that could cause an elevation in his blood pressure.

59. Nevertheless, Prudential argues that Dr. Friedman did not opine that Plaintiff was

12

completely disabled or otherwise precluded from engaging in work. However, as Plaintiff points out, Dr. Friedman did not examine Plaintiff, but based his review on Plaintiff's medical records up to May 25, 2002. Dr. Muirhead, in contrast, was Plaintiff's treating physician, and therefore had the opportunity to examine Plaintiff and was uniquely familiar with his medical conditions. While the parties dispute whether a "treating physician" rule applies in the ERISA context, without reaching this issue, the Court finds that because Dr. Muirhead personally examined Plaintiff and had been his treating physician for nearly four years at the time she authored her April 14, 2005 letter to Prudential, her assessment of Plaintiff's condition and abilities is more persuasive than Dr. Friedman's. Moreover, what is important is that Dr. Friedman <u>did</u> conclude that Plaintiff's aortic dissection affected his work capacity and required Plaintiff to avoid strenuous activity that would raise his blood pressure.

60.     In her April 14, 2005 letter, Dr. Muirhead also noted that based on his medical condition, Plaintiff is extremely limited in his life activities. (HW 2019.) Particularly, Dr. Muirhead indicated that Plaintiff tires easily, and experiences recurring pain, muscle weakness, and visual disturbances. (*Id.*) These physical limitations also demonstrate that Plaintiff is significantly restricted in the tasks and activities that he is able to perform.

61.     Dr. Muirhead also noted that Plaintiff takes multiple medications each day and must continue to take these medication for the rest of his life.

62.     In making its decision, Prudential relied on Ms. David-Harris's Transferable Skills and Labor Market Survey Report, which indicates that even given Plaintiff's health conditions and restrictions, there are still several alternate jobs that Plaintiff may perform. Reviewing Ms. David-Harris's Report, the Court finds it deficient in several respects. Particularly, while Ms. David-Harris considered Dr. Friedman's report, her Transferable Skills Report does not reflect that she considered the extent and severity of Plaintiff's medical conditions and their effect on Plaintiff's physical and mental functionality. In the Medical Information section of her Report, Ms. David-Harris simply states that "[Plaintiff] is a 56-year old male who has a heart condition." She then lists the restrictions that Dr. Friedman identified in his February 28, 2005 report. Thus, there is nothing in Ms. David-Harris's Report indicating that she took into consideration Plaintiff's medical file, Dr. Muirhead's April 14, 2005 letter, Plaintiff's medication regimen and its attendant side effects, or any description from Plaintiff of

13

his physical and mental capabilities. Moreover, although Ms. David-Harris identifies at least five jobs that she opines "are within his physical and temperaments restrictions as set forth by Dr. Friedman," she does not undertake any analysis as to whether <u>Plaintiff</u>, himself, could hold these positions in light of Dr. Muirhead's directive that he avoid any stressful occupation and any activity that would elevate his blood pressure above 140. In fact, Mr. David-Harris does not explain why these positions comport with the medical and physical restrictions that Dr. Muirhead and Dr. Friedman recommended. As a result, the Court cannot ascertain whether any of the positions identified in the Transferable Skills Report are viable work options for Plaintiff. Based on the foregoing deficiencies in Ms. David-Harris's Transferable Skills Report, the Court accords it little probative weight.

63. Reviewing Prudential's June 6, 2005 letter denying Plaintiff's disability claim in light of the foregoing evidence, the Court disagrees with Prudential's bases for denying Plaintiff's long term disability claim. Particularly, in its letter Prudential indicates that although both Dr. Muirhead and Dr. Friedman opined that Plaintiff should avoid physical and emotional stress that could result in elevation of his blood pressure and that his restrictions are unlikely to improve due to the inoperable aortic dissection, neither doctor concluded that Plaintiff is disabled from all work. Additionally, Prudential stated that the restrictions that both doctors recommended would allow Plaintiff to work in another capacity, as evidenced by Ms. David-Harris's Report. Accordingly, Prudential determined that Plaintiff was not totally disabled. Based on the evidence detailed above, the Court finds Prudential's determination to be in error. Although neither Dr. Muirhead or Dr. Friedman expressly stated that Plaintiff is totally disabled, their evaluations of Plaintiff's aortic dissection, and its attendant affects on Plaintiff's physical and mental abilities, including headaches, visual disturbances, muscle fatigue, and chronic pain, aptly support a finding of total disability under the Plan. Moreover, the restrictions that both doctors recommended, including the requirement that Plaintiff avoid any stress or activity that could elevate his blood pressure, further militate in favor of a finding that Plaintiff is incapable of performing any job at any exertional level.

64. Prudential also relied on Ms. David-Harris's Transferable Skills Report as evidence that Plaintiff can perform certain work. However, as discussed above, because Ms. David-Harris's Report fails to take the full extent of Plaintiff's medical conditions and limitations into consideration, and fails

14

1  to evaluate whether Plaintiff would be able to perform the proffered jobs without running afoul of the
2  recommended restrictions, the Court finds Ms. David-Harris's conclusion unpersuasive.

3       65.     Reviewing the foregoing evidence in its entirety, the Court finds that the severity of
4  Plaintiff's aortic dissection, its related medical complications and side effects including headaches,
5  visual disturbances, muscle fatigue, and chronic pain, and the significant restrictions Plaintiff must
6  follow in order to live, render him unable to perform the material and substantial duties of any job for
7  which he is reasonably fitted by his education, training, or experience. The Court therefore finds that
8  Plaintiff has presented sufficient evidence that he is totally disabled under the Policy. Accordingly,
9  Prudential's decision denying Plaintiff's claim for long term disability benefits from October 18, 2004
10 onward, is in error.

11      66.     Plaintiff argues that, should the Court rule in his favor, it should further find that he is
12 entitled to an award of $53,051.23 for past benefits and accrued pre-judgment interest. Because this
13 amount will have changed at the time the Court issues these Findings, the Court declines to rule on
14 Plaintiff's request. Rather, the Court orders the parties to meet and confer to discuss the amount of past
15 benefits due under the Plan. The parties shall meet and confer within two weeks of the filing date of this
16 Order, and shall submit to the Court a stipulated agreement on the amount of payments owed. Should
17 the parties fail to reach an agreement on the amount of past benefits due, Plaintiff may file a brief not
18 exceeding three pages in length calculating the amount of benefits he claims are owed and addressing
19 whether an award of pre-judgment interest is appropriate. Prudential may file an Opposition, not
20 exceeding three pages, no later than 10 days after Plaintiff files his Brief.

21      67.     Plaintiff also asks the Court to grant injunctive relief, "directing Prudential to hereafter
22 pay [Plaintiff] the monthly Adjusted Benefit due . . . until he reaches age 66 on December 19, 2014."
23 (PTB at 26.) Prudential objects to Plaintiff's request for injunctive relief on the ground that the terms
24 of the Plan allow Prudential to request proof of continuing disability. (DTB at 9.) The Court agrees
25 with Prudential. Plaintiff has failed to cite any authority or language in the Plan supporting his position
26 that he is entitled to prospective benefits. Rather, Plaintiff is entitled to long term disability benefits as
27 long as he continues to satisfy the total disability criteria under the Plan. The Court therefore denies
28 Plaintiff's request for injunctive relief.

**III.     Conclusion**

For the foregoing reasons, the Court finds that Plaintiff has demonstrated that he is totally disabled under the terms of the Plan, and is entitled to long term disability benefits from October 18, 2004, forward.  Further, the Court declines to rule on Plaintiff's request for a specific award of past benefits and pre-judgment interest at this time.  The parties shall meet and confer within two weeks of the filing date of this Order, and shall submit to the Court a stipulated agreement on the amount of payments owed.  If after the meet and confer session, the parties fail to reach an agreement on the amount of past benefits due, Plaintiff may file a brief not exceeding three pages in length calculating the amount of benefits he claims are owed and addressing whether an award of pre-judgment interest is appropriate. Prudential may file an Opposition, not exceeding three pages, no later than 10 days after Plaintiff files his Brief. Finally, the Court denies Plaintiff's request for injunctive relief directing Prudential to pay future benefits to Plaintiff.

**IT IS SO ORDERED.**

Dated:         7/31/2006

MARTIN J. JENKINS
UNITED STATES DISTRICT JUDGE